CLERK'S OFFICE
A TRUE COPY
Apr 04, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| United States of America<br>v.<br>Montrell D. HILSON, a.k.a. "Nut"<br>(DOB XX/XX/1993); and<br>Jeremiah D. HILSON, a.k.a. "Man-Man"<br>(DOB XX/XX/1993)<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No.  25-M-346 (SCD) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___November 2024 to April 3, 2025___ in the county of _____Milwaukee_____ in the

___Eastern___ District of _____Wisconsin_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846; 843 (b), 856; and 18 U.S.C. §§ 924(c) | Distribution and Possession with Intent to Distribute Controlled Substances; Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances; Use of Communications Facilities to Facilitate Controlled Substance Felonies; Maintaining a Drug involved Premises; Possession of a Firearm in Furtherance of a Drug Trafficking Crime; and Aiding and Abetting the Aforementioned Offenses. |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.



_____
*Complainant's signature*

Aaron Hoppe, DEA TFO
*Printed name and title*

Sworn via telephone; transmitted via email
pursuant to Fed. R. Crim. 4.1

Date: ___4-4-25___

_____
*Judge's signature*

City and state: _____Milwaukee, Wisconsin_____

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**</u>

I, Aaron Hoppe, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being first duly sworn, hereby depose and state as follows:

## I.     INTRODUCTION AND AGENT BACKGROUND

1.      Pursuant to my official duties, I am submitting this Affidavit in support of an application for a criminal complaint and arrest warrant, for violations of federal law, including violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies), 856 (Maintaining a drug involved premises) and Title 18, United States Code, Sections 924(c) (Possession of a Firearm in Furtherance of Drug Trafficking Crime) and 2(a) (Aiding and Abetting the Aforementioned Offenses).

2.      I have been a law enforcement officer since May 30, 2007.  I am currently assigned to the Waukesha County Sheriff's Department Detective Bureau.  I have been assigned to a Federal Drug Task Force (Milwaukee High Intensity Drug Trafficking Area (HIDTA)) and have been assigned to the Waukesha County Metro Drug Unit in 2012-2013, 2015-2017, and from 2022-Present.  I have been a part of hundreds of state and federal investigations related to drug activity.

3.      I have received extensive training on the investigation of death investigation, narcotics investigation, cell phone analytics, and I am currently a member of the Board of Directors for the Wisconsin Association of Homicide Investigation.

4.      I have conducted investigation ranging from death, drug, property, and child exploitative crimes by analyzing cell phone data including tower usage, call activity, and cellular activity while trying to pinpoint certain locations of suspects and/or victims.  I know that when

conducting an investigation into many drug investigations, and drug related death investigations that the cellular phone data will be a key piece of evidence based on my training and experience. Individuals who sell and use narcotics will mainly utilize their cell phone to set up a transaction for narcotics utilizing their cellular phone or a special application downloaded on their phone. I know it is common practice for most people to rely heavily on the use of cellular telephones or electronic devices for many aspects of their daily lives. People commonly use cellular telephones or electronic devices to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos, which are also used by drug traffickers.

5.     I have received training in the investigation of unlawful possession of firearms and possession of firearms by prohibited persons, as well as drug trafficking and related offenses. I have been trained regarding these offenses and has arrested individuals for federal firearms related offenses, as well as drug trafficking offenses. I have also investigated drug trafficking offenses at the state and federal level, including violations of Title 18, United States Code, Section 922(o) and Title 21, United States Code, Sections 841 and 846. I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

6.     I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel,

corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

7.     I have participated in the execution of numerous search warrants in which weapons, narcotics, and/or evidence of drug trafficking were seized in violation of state and federal laws. I am familiar with the different types and calibers of firearms and ammunition commonly possessed for illegal purposes, as well as the methods used to conduct narcotics trafficking. I have had a variety of formal, informal, and on the job training in the investigation of illegal firearms possession firearms trafficking, and drug trafficking. Additionally, I am familiar with street name(s) of firearms, controlled substances, and respective related topics, as well as has knowledge of the use of money laundering to conceal ill-gotten money.

8.     Based on training, experience and participation in drug trafficking investigations and associated financial investigation involving controlled substances, I know and have observed the following:

a.     I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States.

b.     I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances.

c.     I know that it is common for persons involved in the sales of controlled substances to be armed with guns and/or to keep firearms in their residence/apartment for their protection and the protection of their controlled substances. I also know it is common for those engaged in drug trafficking to utilized security cameras to surveille their residences, stash houses, and other locations to protect themselves from drug rivals and law enforcement detections.

d.  It is a common practice for individuals engaged in high level drug trafficking activities to use multiple locations to conduct their drug trafficking activities. For example, a "stash house" is a location used to store controlled substances, firearms, and U.S. Currency.

e.  I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them.

f.  I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business.

g.  I know it is common for persons involved in large-scale drug trafficking and related financial crimes to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as drug ledgers, currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. Because narcotics trafficking generates large sums of cash, it requires the keeping of detailed records as to the distribution of narcotics as well as the laundering of the proceeds. Such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the narcotics proceeds on behalf of the organization. These records, unlike controlled substances, are often maintained for long periods, even several years. These items are maintained by the traffickers within residences, stash houses, vehicles, or other locations over which they maintain dominion and control.

h.  I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have immediate access to them.

i.  It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

j.  It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets

Page 4

or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

k.      Likewise, it is common for businesses who engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or placing the transaction in a nominee name. These businesses may need to keep these false records for inventory or bookkeeping reasons. However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment.

l.      I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities.

m.      I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering and structuring activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency.

n.      I know that the Currency Transaction Report (CTR) (Fincen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

o.      I know drug traffickers commonly maintain addresses or telephones numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization(s).

p.      I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering and structuring activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing,

whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices.

q.    Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or related financial crimes; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

9.    Affiant is participating in an investigation of heroin/fentanyl drug trafficking organization (DTO) involving Montrell D. HILSON, a.k.a. "Nut" (DOB XX/XX/1993), Jeremiah D. HILSON, a.k.a. "Man-Man" (DOB XX/XX/1993, and others. Affiant is familiar with the facts and circumstances regarding this investigation as a result of my personal knowledge and participation in this investigation, and my review of: (a) controlled buys; documentary evidence; physical surveillance; telephone records; electronic surveillance; and physical seizures (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officer prepared during the course of their official duties, all of which I believe to be truthful and reliable; and (c) information obtained from numerous witnesses, including confidential sources, whose reliability is established separately herein. This affidavit is intended to show merely that there is probable cause for the requested criminal complaint and does not set forth all of

Affiant's knowledge about this matter.

10.     Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

11.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies), 856 (Maintaining a drug involved premises) and Title 18, United States Code, Sections 924(c) (Possession of a Firearm in Furtherance of Drug Trafficking Crime) and 2(a) (Aiding and Abetting the Aforementioned Offenses), have been committed by Montrell D. HILSON, a.k.a. "Nut" (DOB XX/XX/1993), Jeremiah D. HILSON, a.k.a. "Man-Man" (DOB XX/XX/1993), and other known and unidentified subjects in the Eastern District of Wisconsin. This affidavit is submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint against Montrell D. HILSON and Jeremiah D. HILSON  (DOB XX/XX/1993) and for an arrest warrant.

## II.     PROBABLE CAUSE

### A.     Background and Summary of Investigation

12.     The United States government, including the HIDTA, DEA, Waukesha County Sheriff's Department and the Waukesha County Metro Drug Unit, is conducting a drug trafficking investigation of Montrell D. HILSON, a.k.a. "Nut" (DOB XX/XX/1993),  Jeremiah D. HILSON, a.k.a. "Man-Man" (DOB XX/XX/1993), and other identified and unidentified individuals for violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with

Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies), 856 (Maintaining a drug involved premises) and Title 18, United States Code, Sections 924(c) (Possession of a Firearm in Furtherance of Drug Trafficking Crime) and 2(a) (Aiding and Abetting the Aforementioned Offenses).

13.     During a debrief with a confidential source (CS-1), CS-1 provided case agents with information concerning two individuals that were selling large amounts of heroin/fentanyl and methamphetamine. The CS-1 provided information regarding "Nut" and stated that "Nut" is family members of the co-defendants who were federally indicted.  CS-1 advised that the basis of CS-1's knowledge concerning the drug trafficking of "Nut" comes from CS-1's own personal observations.

14.     Case agents believe that CS-1 is credible and reliable.  CS-1 has provided information concerning individuals involved in illegal activities which has been independently verified through this investigation.  The information has been verified through controlled buys, video recordings obtained during the controlled buys, queries through law enforcement databases, and surveillance. CS-1 has no arrests or convictions relating to dishonesty but has past arrests or convictions for felony drug offenses, inducing possession with intent to deliver cocaine, possession with intent to deliver/manufacture a controlled substance, manufacture/deliver cocaine, possession of THC, possession with intent to deliver heroin, and maintaining a drug trafficking place.  CS-1 currently has an open case through Waukesha County for felony battery and bail jumping, and misdemeanor traffic offenses. CS-1 is cooperating with case agents in hope of receiving consideration for CS-1's open/pending Waukesha County criminal and traffic offenses.  The information provided by CS-1 concerning what occurred during each of these buys was

corroborated by case agent surveillance and/or review of covertly recorded audio and/or video made by CS-1 of the transactions at the request of case agents. CS-1's information has never been found to be false or misleading. For these reasons, I consider CS-1 to be reliable.

15.     Case agents identified "Nut" as Montrell D. HILSON. Case agents had previous contacts with Montrell D. HILSON, who had acknowledged that he goes by "Nut." Case agents had previously identified Montrell D. HILSON as a family member of Qian COLLINS and multiple other co-defendants in case Eastern District of Wisconsin Case 24-CR-28. Case agents then showed previously obtained picture of Montrell D. HILSON to CS-1 who positively identified Montrell D. HILSON as "Nut".

16.     CS-1 stated that CS-1 has regular communication with Montrell D. HILSON, via phone conversations, where Montrell D. HILSON provides information to CS-1. CS-1 indicated that CS-1 has known Montrell D. HILSON for several years, and Montrell D. HILSON "trusts" CS-1 enough to provide information regarding his (Montrell D. HILSON) illegal narcotic trafficking, including when Montrell D. HILSON picks up heroin and/or fentanyl, where it is being stored, and how much illegal narcotics are being purchased and sold.

17.     CS-1 was able to identify a "stash" house currently being utilized by Montrell D. HILSON as XX66 North 23rd Street, Milwaukee, Wisconsin. CS-1 stated that either Montrell D. HILSON or another person would travel to Chicago every 5-7 days to purchase multiple kilograms of heroin/fentanyl and transport it back to the Milwaukee area. Once in Milwaukee the heroin/fentanyl is "cut" into several additional kilos and prepared for distribution. Case agents know this to mean that the purchased heroin/fentanyl, is mixed with different types of "cutting" agents, such as lactose, which is then mixed to create a larger amount of illegal narcotics to distribute.

18.     CS-1 was unable to provide any further details regarding the source of supply or destination in the Chicago area, where Montrell D. HILSON went to retrieve the heroin/fentanyl.

19.     Case agents learned from reviewing online Wisconsin Circuit Court records (CCAP) that Montrell D. HILSON was convicted on August 16, 2016, in Waukesha County case 2016CF000991, for the felony offense of possession with intent to deliver heroin, with a dangerous weapon.

20.     Case agents learned from reviewing online Wisconsin Circuit Court records (CCAP) that Montrell D. HILSON was convicted on August 21, 2018, in Milwaukee County case 2018CF003956, for the felony offense of possession of a firearm by a felon and possession of narcotic drugs.

21.     Case agents learned that Montrell D. HILSON is on active extended supervision through the Wisconsin Department of Corrections (WI DOC) and was released from the Kettle Moraine Correctional Institution on June 13, 2023.

22.     Case agents learned that Montrell D. HILSON reported to WI DOC that he is residing at his mother's residence located at XX05 North 21st Street, Milwaukee, Wisconsin and provided a telephone number of XXX-XXX-8450 as a number he is currently using.

23.     Case agents obtained a copy of Milwaukee Police Department Incident Report C2409020146 which named Montrell D. HILSON as the suspect. The incident was reported on September 2, 2024, and was listed as a battery – domestic abuse incident that occurred at XX66 North 23rd Street, Milwaukee, Wisconsin. The caller stated a male was choking a female and identified the suspect as "Peanut". Officers arrived on scene who made contact with the victim, who identified her live-in boyfriend and father of her children Montrell D. HILSON (XX/XX/1993) as the suspect. The victim alleged that Montrell D. HILSON intentionally and

Page 10

without consent struck her causing pain and fear. The victim advised the two resided at XX66 North 23rd Street, Milwaukee, Wisconsin and have lived together for four years. The victim indicated that she was unemployed and identified Montrell D. HILSON as the "breadwinner of the family".

24.     Based on my training and experience, I know that those engaged in criminal offense and on supervision with the criminal justice system, will often use family's addresses to provide as residence, though in fact the individuals are residing at a different location and usually engaged in illegal conduct at this other location.  These offenders will often provide false addresses in an attempt to evade law enforcement.

**B.     Controlled Buys**

25.     Based upon my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant purchases drugs from a target. As detailed below, CS-1 conducted two controlled buys from Montrell D. HILSON on behalf of law enforcement. Generally during the below listed controlled buys of controlled substances, CS-1 placed a phone call to the target, captured audio and video of the controlled buy, was followed to and from the controlled buy location, CS-1 and his/her vehicle was searched before and after the controlled purchase with no drugs, money, or weapons located, was provided "buy money", debriefed after the controlled buy, and the above evidence and statements reviewed and verified by law enforcement.  Additionally, the controlled substances were all weighed and tested positive for the listed substance using Nark II test kits following the printed instructions.

**a.   November 26, 2024 Controlled Buy from Montrell D. HILSON**

26.     On November 26, 2024, CS-1, purchased approximately 20.0 grams of suspected fentanyl in exchange for $550.00 in pre-recorded US Currency from an individual later confirmed

to be Montrell D. HILSON. During the transaction, which occurred in the area of North 35th Street and West Burleigh Street in Milwaukee, Wisconsin, Montrell D. HILSON was observed by case agents exiting a business (Frank's Hand Car Wash at XX21 North 36th Street, Milwaukee, Wisconsin). Montrell D. HILSON entered CS-1's vehicle and completed the transaction with CS-1. Montrell D. HILSON was observed by case agents exiting CS-1's vehicle and entering the business after the transaction. Case agents positively identified Montrell D. HILSON as the individual who completed the transaction with CS-1. CS-1 confirmed that while in CS-1's vehicle, Montrell D. HILSON supplied CS-1 with a quantity of suspected drugs and identified "Nut" as the person who completed the transaction with CS-1. Case agents were unable to identify a vehicle possibly being utilized by Montrell D. HILSON during that transaction. CS-1 provided the quantity of suspected fentanyl provided to CS-1 by Montrell D. HILSON to case agents.

27. Case agents reviewed recordings of the transaction and were able to decipher that CS-1 and Montrell D. HILSON were discussing prices of larger amounts of fentanyl during the transaction. Case agents reviewed CS-1's telephone and observed that the number CS-1 utilized to contact Montrell D. HILSON to complete the transaction was XXX-XXX-8881.

28. Case agents received the laboratory report for the suspected fentanyl that was purchased from HILSON on November 26, 2024, and the report indicated that the "primary drug" was 19.9 grams of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidnyl] propenamide (fentanyl), with "All other reported drugs" being N-Phenyl-N-[1-(2-phenylethyl)-4-piperidnyl] propenamide (fentanyl), heroin, Xylazine, and Trazadone.

**b. December 19, 2024 Controlled Buy from Montrell D. HILSON**

29. On December 19, 2024, CS-1 purchased 24.2 net grams of suspected fentanyl in exchange for $700.00 in pre-recorded US Currency from an individual later confirmed to be

Montrell D. HILSON. The transaction occurred in the rear of a business identified as Capitol Nails and Salon located at XX33 West Capitol Drive, Milwaukee, Wisconsin. During the transaction, Montrell D. HILSON was driven to the location by an individual later identified as Thomas TERRY, in a 2017 Black Ford Focus, bearing Wisconsin license plate AAV3674, which is registered to TERRY (Focus). Upon arrival to the location, Montrell D. HILSON, who was the front seat passenger in the Focus, contacted CS-1 and instructed CS-1 to enter the Focus. As CS-1 approached the Focus, TERRY (the operator) exited the front driver's seat and CS-1 entered the front driver's seat as TERRY walked away. Case agents were able to positively identify TERRY during that time.

30. During the duration of the drug transaction, Montrell D. HILSON had rolled the front passenger window down to the point where case agents were able to positively identify him through the front passenger window. After the transaction was completed, CS-1 exited the Focus and TERRY was observed re-entering the Focus. CS-1 confirmed that while inside the Focus, Montrell D. HILSON provided CS-1 with a quantity of suspected fentanyl in exchange for the pre-recorded buy money. CS-1 confirmed that Montrell D. HILSON was the individual with whom CS-1 conducted the transaction. CS-1 provided the quantity of suspected fentanyl provided to CS-1 by Montrell D. HILSON to case agents. Case agents reviewed CS-1's telephone and observed that the number CS-1 utilized to contact Montrell D. HILSON to complete the transaction was XXX-XXX-8881.

31. Case agents received the laboratory report for the suspected fentanyl that was purchased from HILSON on December 19, 2024, and the report indicated that the "primary drug" was 23.10 grams of heroin with "All other reported drugs" being, N-Phenyl-N-[1-(2-phenylethyl)-4-piperidnyl] propenamide (Fentanyl) and Xylazine.

32.     Case agents then followed the Focus (being operated by TERRY) as it drove directly to the residence located at 2866 North 23rd Street, Milwaukee, Wisconsin (**Target Location 1**).  Case agents observed Montrell D. HILSON exit the Focus and enter the rear of 2866 North 23rd Street, Milwaukee, Wisconsin (**Target Location 1**).  The Focus was observed by case agents leaving the area after Montrell D. HILSON entered 2866 North 23rd Street, Milwaukee, Wisconsin (**Target Location 1**).

### C. Surveillance of Target Location 1

33.     Between November 2024 and February 2025, case agents have occasionally conducted surveillance of XX66 North 23rd Street, Milwaukee, Wisconsin.  During this time, case agents observed an early 2000's tan/brown Buick LeSabre (LeSabre) parked in the rear of the residence of XX66 North 23rd Street, Milwaukee, Wisconsin.  Case agents observed that there was no visible vehicle registration and no other identifying markings on the LeSabre, which would assist in trying to identify who the LeSabre is registered to. Case agents checked law enforcement databases and public databases and could not find any Buick associated to Montrell D. HILSON.

34.     On October 29, 2024, case agents conducting surveillance at XX66 North 23rd Street, Milwaukee, Wisconsin observed Montrell D. HILSON exit XX66 North 23rd Street, Milwaukee, Wisconsin and contacted the operators of two vehicles that were parked in front of XX66 North 23rd Street, Milwaukee, Wisconsin.

35.     On February 21, 2025, case agents were conducting surveillance at XX66 North 23rd Street, Milwaukee, Wisconsin**.**  Case agents observed an unknown white male operating a 2015 Infiniti bearing Wisconsin license plate AYT-6191 (Infiniti), pull up to the XX66 North 23rd Street, Milwaukee, Wisconsin, exit the Infiniti, and walk to the rear door of XX66 North 23rd Street, Milwaukee, Wisconsin.  Case agents observed Montrell D. HILSON open the door and

conduct a hand-to-hand transaction with the unknown male. Based on case agents' training and experience in drug investigations, case agents believe the contact between Montrell D. HILSON and the unknown male was a transaction for illegal narcotics based on the behaviors observed which is indictive of a commonly used method to conduct drug transactions. The white male then returned to the Infiniti before driving away.

36.     Also on February 21, 2025, Montrell D. HILSON confronted the case agent conducting surveillance.

**D. Additional Communication Between CS-1 and Montrell D. HILSON**

37.     On February 24, 2025, case agents were notified by CS-1 that Montrell D. HILSON had reached out to CS-1, via phone call. Montrell D. HILSON told CS-1 that he (Montrell D. HILSON) had just purchased 250 grams of fentanyl and was able to sell CS-1 any amount that was needed. In addition, Montrell D. HILSON informed CS-1 that he (HILSON) had observed a "suspicious van" recently and moved the fentanyl to a house in the area of North 19th Street and West Hampton Avenue, Milwaukee, Wisconsin.

38.     Case agents believe that Montrell D. HILSON was referring to the February 21, 2025, incident where he confronted the case agent conducting surveillance. The case agent who was confronted was in fact operating a minivan when confronted by Montrell D. HILSON, and this information was not shared with CS-1 by law enforcement. This leads case agents to believe the information Montrell D. HILSON provided to CS-1 was accurate and truthful.

39.     On February 21, 2025, shortly after the previously mentioned short term contact, Montrell D. HILSON exited XX66 North 23rd Street, Milwaukee, Wisconsin and entered the front driver's seat of the LeSabre and backed out of the parking slab in the rear of XX66 North 23rd Street, Milwaukee, Wisconsin where the LeSabre had been parked. Montrell D. HILSON then

drove up to a vehicle being operated by case agents conducting surveillance. Montrell D. HILSON rolled down the driver's side window and asked the case agent what they were doing in the area. After a short conversation, Montrell D. HILSON drove off, but case agents confirmed that Montrell D. HILSON was the operator and sole occupant of the LeSabre during this interaction.

**E. LeSabre GPS Warrant and Physical Surveillance of Montrell D. Hilson**

40. On February 28, 2025, Magistrate Judge Nancy Joseph authorized the use of a GPS tracker for the LeSabre.

41. On the morning of March 3, 2025, case agents responded to XX66 North 23rd Street, Milwaukee, Wisconsin and observed the LeSabre positioned on the parking slab directly behind XX66 North 23rd Street, Milwaukee, Wisconsin. Case agents subsequently installed the electronic tracking device without incident.

42. On the afternoon of March 10, 2025, case agents were monitoring the live location of the LeSabre and ultimately conducted physical surveillance of the LeSabre. The LeSabre was located at a gas station in the area of North 20th Street and West Center Street, Milwaukee, Wisconsin. While at the gas station Montrell D. HILSON was observed in the driver's seat of the LeSabre and appeared to be the sole occupant. From the gas station case agents followed Montrell D. HILSON as he drove the subject vehicle to XX18 North 51st Street, Milwaukee, Wisconsin. Montrell D. HILSON parked the LeSabre in the alleyway directly south of this residence at 2:02 pm, where he remained until 2:14 pm. While parked, case agents observed an African American male exit the residence of XX18 North 51st Street and approach the LeSabre. Case agents observed what appeared to be a hand-to-hand transaction between the male and Montrell D. HILSON. Based on case agents training and experience in drug investigations, case agents believe the contact between Montrell D. HILSON and the male was a transaction for illegal narcotics based on the

Page 16

behaviors observed, which is indictive of a commonly used method to conduct drug transactions.

43. Case agents then followed Montrell D. HILSON to the area of North 64th Street, south of West Sheridan Avenue, Milwaukee, Wisconsin, in front of numerous apartments. Case agents identified the apartment which Montrell D. HILSON had parked in front of as XX49 North 64th Street. Montrell D. HILSON was observed meeting with an unidentified individual who had entered the front passenger seat of the LeSabre. Montrell D. HILSON remained parked in front of the apartment from 2:26 pm to 2:32 pm. Case agents were unable to confirm whether or not the unidentified individual had exited the LeSabre prior to its departure.

44. Montrell D. HILSON continued as the operator of the LeSabre and was followed to the area of South 36th Street and West Scott Street, Milwaukee, Wisconsin. Montrell D. HILSON arrived at 3:24 pm and remained there until 3:32 pm. Case agents observed an unidentified individual exit XX01 South 36th Street and enter the front passenger seat of the LeSabre. This led case agents to believe that the individual from the area of XX49 North 64th Street had exited the LeSabre prior to its departure from that address. After a short time, the individual exited the front passenger seat of the LeSabre and Montrell D. HILSON began to drive away from the location.

45. Based on case agents training and experience in drug investigations, case agents believe these short-term contact between Montrell D. HILSON these individuals inside the LeSabre were consistent with transaction for illegal narcotics. This is based on the behaviors observed which is indictive of a commonly used method to conduct drug transactions.

46. Montrell D. HILSON was subsequently followed to his residence, XX66 North 23rd Street, Milwaukee, Wisconsin, at which time case agents observed him exit the LeSabre and walk towards XX66 North 23rd Street, Milwaukee, Wisconsin. At that time physical surveillance

was concluded at 3:46 pm.

47.     Based on the investigation, including physical surveillance, review of police reports, and review of court authorized GPS data of the LeSabre, case agents determined Montrell D. HILSON resided at XX66 North 23rd Street, Milwaukee, Wisconsin.

### F.  Communication Between Montrell D. HILSON and Daniel BERCZYK

48.     The Waukesha County Drug Task Force received information regarding an individual, identified as Daniel BERCZYK, a resident of the Village of Muskego, who was believed to be distributing narcotics in Milwaukee and Waukesha Counties. In March of 2025 the Waukesha County Drug Task Force was made area that BERCZYK had been arrested by the City of West Allis Police Department for operating a motor vehicle with a registration plate that had been reported as stolen. During the arrest, West Allis Police found BERCZYK to be in possession of 27.47 grams of methamphetamine, 13.07 grams of heroin, 2.5 grams of crack cocaine and 2.47 grams of powdered cocaine.

49.     Based on the investigation, the Apple iPhone located in BERCZYK's possession was turned over to agents of the Waukesha County Drug Task Force. A Waukesha County Circuit Court Warrant was authorized to conduct a search of the device. During the subsequent review of the files extracted from the Apple iPhone, case agents were alerted to the fact that BERCZYK had been in contact with Montrell D. HILSON through three phone numbers: XXX-XXX-8881, XXX-XXX-8450 and XXX-XXX-8053. Telephone number XXX-XXX-8881 had been identified as Montrell D. HILSON's drug phone line by CS-1 and was utilized by Montrell D. HILSON to conduct the controlled drug transactions described previously. Telephone number XXX-XXX-8450 was also identified as being a phone line utilized by Montrell D. HILSON by CS-1 and was the phone number Montrell D. HILSON had provided WI DOC Probation and Parole. Telephone

number XXX-XXX-8053 had been identified as an additional phone line utilized by Montrell D. HILSON through a separate City of West Allis Police Department Investigation.

50.     Case agents reviewed text messages between BERCZYK and all three of Montrell D. HILSON's phone numbers. Based on training and experience, case agents found reason to believe that BERCZYK had been purchasing drugs from Montrell D. HILSON.

51.     BERCZYK had been in consistent contact with Montrell D. HILSON through telephone number XXX-XXX-8881, saved as contact name "TJ Dude", between January 30, 2024, and February 27, 2025. Case agents noted, based on their training and experience, that most of the text message contact was in reference to the sale and purchase of narcotics, specifically the drug "B", which is known to be used to refer to heroin. Text communication showed that Montrell D. HILSON had also sold BERCZYK crack cocaine and powder cocaine.

52.     For example, on May 14, 2024 BERCZYK sent Montrell D. HILSON "the hard was straight soft sucked the tan B was fire I need some b". Case agents know that the term "hard" is used to reference crack cocaine while the term "soft" is used to reference powder cocaine.

53.     On multiple occasions through the time frame of the conversation, Montrell D. HILSON would direct BERCZYK to call him in response to a text message sent by BERCZYK. Based on my training and experience, those engaged in drug trafficking may avoid sending text messages, because the conservation can be retrieved from cellphones, even the user deletes the messages.  It was clear, based on the review, that Montrell D. HILSON did not like to communicate via text message and preferred to communicate through phone calls.

54.     On August 25, 2024, Montrell D. HILSON told BERCZYK, "please don't call my phone nomore". The communication between the two was limited until January 8, 2025. On that date, based on the conversation, BERCZYK had been storing a vehicle behind Montrell D.

HILSON's residence. It is believed the vehicle had possibly been stolen or involved in a crime, as in a response to a question about the vehicle Montrell D. HILSON responded, "You bogus bro. It's just fuck me and what I got going on huh? Police ride through this alley all day every day. I I already got enough going on over here already. And you gone make me even more hot with this car. Just bringing heat to the house. I got to much to lose bro".

55.     There was only one text communication between BERCZYK and telephone number XXX-XXX-8450, which was not a saved contact. The message was sent by BERCZYK on February 17, 2024, and read, "Full of shit".

56.     BERCZYK had been in contact with Montrell D. HILSON through telephone XXX-XXX-8053, saved as contact name "TJ 22 Loyd", between January 13, 2025 and February 25, 2025. A majority of the conversation, which occurred in January, revolved around BERCZYK asking Montrell D. HILSON for money that was owed to him. On February 14, 2025, BERCZYK asked Montrell D. HILSON, "yo im in Waukesha…I'm getting on freeway might be sooner you holding and B". Montrell D. HILSON responded, "800". Based on case agents training and experience, these messages would be consistent with the sale of heroin, "B", for $800.

**G. Communication between Montrell D. HILSON and CS-1**

57.     On March 27, 2025, case agents were contacted by CS-1. CS-1 indicated that they were in voice communication with Montrell D. HILSON.

58.     CS-1 stated that Montrell D. HILSON told him/her that he (Montrell D. HILSON) was currently in possession of 300 grams of heroin. Montrell D. HILSON informed CS-1 that the 300 grams of heroin was previously purchased from "Man Man" and another individual.  Montrell D. HILSON advised CS-1 of the poor quality of the heroin and advised that his "customers" had been calling him (Montrell D. HILSON) and complaining about the quality of the heroin.

59.     Montrell D. HILSON told CS-1 that he (Montrell D. HILSON) had contacted "Man Man" and the other person and requested his money back, which they denied. Montrell D. HILSON stated that they had told him (Montrell D. HILSON) that they would provide him with a small amount of fentanyl to mix in with the product, which would improve its quality. Montrell D. HILSON told CS-1 that he (Montrell D. HILSON) was uninterested in the fentanyl and informed CS-1 that he (Montrell D. HILSON) had plans to contact a relative from out of state to come and "rob them" and "shoot up their vehicle".

60.     CS-1 indicated that they believed Montrell D. HILSON to be serious with this threat. CS-1 stated that in order to diffuse the situation and have the ability to keep law enforcement informed of Montrell D. HILSON's actions they instructed Montrell D. HILSON to stand down and offered to handle the problem. Montrell D. HILSON informed CS-1 that he (Montrell D. HILSON) had been in the residence of "Man Man" on March 26, 2025, and advised that he had observed what he believed to be 1500 grams or 1.5 kilograms of fentanyl that "Man Man" was in possession of.

61.     While on the phone with case agents, CS-1 contacted Montrell D. HILSON on a separate phone line. This communication was audio recorded by case agents. During the phone call, CS-1 was on their way to meet Montrell D. HILSON, who informed them he (Montrell D. HILSON) was in the area of 51st and Center Street, Milwaukee, Wisconsin. Montrell D. HILSON directed CS-1 to drive to the area of 41st and Burleigh Street and that he (Montrell D. HILSON) would meet them there. Montrell D. HILSON later changed the location to North 42nd Street rather than North 41st Street. Montrell D. HILSON advised he was driving in a tan Buick. Case agents confirmed through the live tracking device that the LeSabre was mobile and traveling towards the area of North 42nd Street and West Burleigh Street.

62.     Montrell D. HILSON then confirmed what CS-1 had previously stated to case agents.  Montrell D. HILSON indicated that he had purchased 300 grams of "garbage" the day prior from "Man Man" and confirmed that he (Montrell D. HILSON) had observed product within "Man Man's" residence the day prior. Montrell D. HILSON advised that he had already been "serving up" but that his customers all called him back and complained. Montrell D. HILSON spoke about having his cousin come up and "take care of things" at which point CS-1 offered to handle the situation. During the conversation Montrell D. HILSON referred to as "Man Man" as his "brother" and provided CS-1 the Facebook profile of "RIP Marco", which CS-1 later provided to case agents.

63.     Also during the recorded call, CS-1 asked Montrell D. HILSON if he could call to order up some fentanyl and asked if Montrell D. HILSON had their numbers (Man Man and the other person's).  Montrell D. HILSON replied that he did not know their "boy numbers".  Based on training and experience, case agents believe Montrell D. HILSON is referring to a known drug telephone numbers(boy being heroin) utilized by "Man Man" or the other person to conduct illegal narcotic transactions.  Montrell D. HILSON then stated "I only know their main numbers".  Based on training and experience, case agents believe to mean Montrell D. HILSON only has "Man Man's" and the other person's personal numbers which are usually not utilized to conduct transactions.

64.     When CS-1 and Montrell D. HILSON were each in the area of "Man Man's" residence, Montrell D. HILSON directed CS-1 to follow him so that he could point out the residence. Montrell D. HILSON advised it was the "third one on the right" from West Auer Avenue and stated, "XX08", "downstairs". Montrell D. HILSON informed CS-1 that "Man Man" drove a white Honda and described it as being "tinted" and that he believed it was a 2016 or 2017 model

year. Montrell D. HILSON told CS-1 that "Man Man" resides at the residence (later determined to be XX08 North 42nd Street, Milwaukee, Wisconsin) alone and that he has two dogs, described as being smaller "bullies".

65.     After ending the telephone call with Montrell D. HILSON, CS-1 provided case agents with the address of XX08 North 42nd Street, Milwaukee, Wisconsin, as "Man Man's" residence, which was consistent with the phone conversation and GPS information for the LeSabre.

66.     With this information, case agents utilized a law enforcement database to search for individuals associated with XX08 North 42nd Street, Milwaukee, Wisconsin. Case agents located an individual identified as Jeremiah D. HILSON (DOB XX/XX/1993), who had previously been associated with that address.

67.     Case agents then conducted a search through Wisconsin Circuit Court Access and reviewed Dunn County Case Number 2025CT000026, offense date of December 23, 2024, which listed Jeremiah D. HILSON (DOB XX/XX1993)'s address as XX08 North 42nd Street, Milwaukee, Wisconsin.

68.     Case agents also review Wisconsin Circuit Court Access and review Milwaukee County Case 24PA1916PJ, in which Jeremiah D. HILSON JR (DOB XX/1993) provided a listed address of XX08 North 42nd Street, Milwaukee, Wisconsin.  The last court hearing was dated November 25, 2024, and though Jeremiah D. HILSON did not appear, the court recorded indicated "service is timely and proper" and the commissioner found "BOTH Respondents have been served", which would include Jeremiah D. HILSON.

69.     Case agents also review Wisconsin Department of Transportation records, which indicated Jeremiah D. HILSON's (DOB XX/XX/1993) listed address as XX08 North 42nd Street, Milwaukee, Wisconsin.

70.     Case agents reviewed the Facebook profile "Rip Marco", account ID 100010659462438, and compared the photographs to Jeremiah D. HILSON's (DOB XX/XX/1993) booking photograph taken on May 20, 2024. Case agents noted that the chest tattoo observed on the Facebook profile was identical to the chest tattoo seen in the booking photograph. Additionally, case agents provided CS-1 with Jeremiah D. HILSON's (DOB XX/XX/1993) Department of Transportation photograph.  CS-1 confirmed the identity of Jeremiah D. HILSON's (DOB XX/XX/1993) as "Man Man". CS-1 only knew Jeremiah D. HILSON as "Man Man" but was aware that Jeremiah D. HILSON's (DOB XX/XX/1993) father had the same name and went by the nick name of "Bootsie".

71.     Case agents confirmed through open-source records that Jeremiah D. HILSON's (DOB XX/XX1993) father did have the same name, Jeremiah D. Hilson (DOB XX/XX/1977). Further, case agents review records with MPD and WI DOC, which indicated Jeremiah D. Hilson (DOB XX/XX1977), goes by the nickname "Bootsie".  Further WI DOC records indicated Jeremiah D. Hilson DOB XX/XX/1977 is currently in custody at Milwaukee Secure Detention Facility.

72.     Case agents showed CS-1 a photograph of Jeremiah D. HILSON (DOB XX/XX/1993), obtained from the "Rip Marco" Facebook account. CS-1 confirmed that the person in the photograph was the person they knew to be "Man Man" and case agents knew to be Jeremiah D. HILSON (DOB XX/XX/1993).

73.     Upon review of Jeremiah D. HILSON's (DOB XX/XX/1993), Wisconsin criminal record it was learned that he had been previously arrested regarding multiple felony drug offenses between 2013 and 2019. Case agents review Wisconsin Circuit Court Access and determined Jeremiah D. HILSON (DOB XX/XX/1993) had a prior drug offense, Milwaukee County case

2014CM2985, possession of THC; and operating while intoxicated 2nd offense, Milwaukee County Case 15CT267.

74.    On March 27, 2025, case agents conducted physical surveillance at XX08 North 42nd Street, Milwaukee, Wisconsin. At approximately 5:08 pm case agents observed a Chevrolet Malibu bearing Wisconsin license plate AZH-3399 (Malibu) park in front of XX08 North 42nd Street, Milwaukee, Wisconsin. Case agents observed an African American female with long red hair exit the house and meet with the unidentified occupant(s) of the Malibu. After a short contact, the female re-entered XX08 North 42nd Street, Milwaukee, Wisconsin. Based on training and experience in drug investigations, case agents believe this short-term contact between the female and the Malibu was consistent with transaction for illegal narcotics. This is based on the behaviors observed which is indictive of a commonly used method to conduct drug transactions.

**H. Arrest of Montrell Hillson**

75.    On April 3, 2025, case agents executed a federal search warrant of Montrell D. HILSON's residence, XX66 North 23rd Street, Milwaukee, Wisconsin. Montrell D. HILSON was located inside the residence. During the search of the residence case agents located the following notable items.

  i.   four digital scales found in dresser drawer located a bedroom (Room C) utilized by Montrell D. HILSON;
 ii.   one digital scale located in another bedroom (Room B) utilized by Montrell D. HILSON;
iii.   one plastic bag containing 2.3 grams of a brown powder that tested positive for fentanyl, located with the single digital scale located in Room B.
 iv.   two cellphones; and
  v.   a plastic blender with white powdery residue testing positive for fentanyl, located under kitchen sink (Room D).

76.    Montrell D. HILSON was arrested and transported to the Waukesha County Sheriff's Department for a recorded interview. Montrell D. HILSON was read his Corley and

Miranda rights and waived both. During the recorded interview Montrell D. HILSON admitted that he has been selling heroin/fentanyl for at least the past six months. Montrell D. HILSON stated he has around "10-15 regular customers he is selling heroin/fentanyl to in the Milwaukee area. Montrell D. HILSON acknowledged that he meets people at local gas stations near his residence, which is consistent with information case agents learned during a review of a court authorized GPS tracking device on Montrell D. HILSON's vehicle. Montrell D. HILSON stated that the most he has ever sold was "10 grams" which case agents know to be false based on previous controlled transactions completed with Montrell D. HILSON.

77.     Montrell D. HILSON stated that both of the cellphones located the residence were his phones and admitted that thea black flip phone was utilized to conduct drug transactions. Montrell D. HILSON stated that the number for the "flip phone" was 414-627-8881, which was the same telephone number utilized by case agents. During a follow up interview conducted with Montrell D. HILSON, he admitted that Jeremiah D. HILSON (DOB XX/XX/1993) is his brother, with who he shares the same father with. Montrell D. HILSON stated that he purchases heroin/fentanyl from Jeremiah D. HILSON and believed that Jeremiah was recently in possession of 500 grams of fentanyl/heroin and multiple firearms.

78.     Case agents were unaware of the items located, specifically the blender and 2.3 grams of powder testing positive for fentanyl, at the time of the initial interview. Case agents returned to the Waukesha County Jail later in the afternoon of April 3, 2025, and attempted to interview Montrell D. HILSON about those items but he declined to speak with case agents stating he did not want to talk about "Jeremiah".

     a.  **Review of HILSON's cellphone**

79.     Case agents reviewed the "flip phone", with telephone number 414-627-8881,

Page 26

belonging to Montrell D. HILSON and found several drug related conversations.

80. The first conversation reviewed was between HILSON and the unnamed contact 262-733-7055. The conversation began on October 16, 2024, and the initial text messages appeared to revolve around a dispute about money. On December 22, 2024, HILSON told the unnamed individual, "That's why I don't deal with you now. Please don't call my phone no more." On December 29, 2024, HILSON stated, "New stuff". The unnamed contact didn't reply until January 2, 2025, "A he text n call like u got the best fire fire ay I appreciate yo mo3 looking ass thanks big bro ua 100 ass nigga omk stay like dat i respect a nigga like u wish it was more like u nobs stay dangerous". On January 7, 2025, HILSON stated, "New stuff". The unnamed contact did not acknowledge the message. On January 9, 2025, HILSON stated, "I need some girl bro". The unnamed contact replied, "I can't believe you I'm day same nigga dat fed you damn near every nite in the joint give I anything treated you like a brother all over sum drugs my nigga I fucked up but then u get out the joint a whole different person". This was the last text message sent between the two until March, 2025. On March 15, 2025, the unnamed contact asked, "U ever get sum different shit". On April 29, 2025, HILSON asked, "2 for 40?". The unnamed contact replied on April 30, 2025, "140 fal th seven...40$?...2". HILSON replied, "45. This the last. I need it". The unnamed contact responded, "See you taxing me now". HILSON stated, "I really need it".

81. Based on my training and experience the messages between HILSON and telephone number 262-733-7055 are consistent with drug trafficking. For example, "the best fire" would be related to heroin/fentanyl, as "fire" is a slang term used by drug traffickers for heroin/ fentanyl. Further, "girl" is often used as code to refer to cocaine by drug traffickers.

82. HILSON had text communication with the contact "Matt And Jess", telephone number 414-916-2196. Based on training, experience, and review of the conversation, case agents

Page 27

believe "Matt and Jess" were drug customers of HILSON. On November 15, 2024, HILSON stated, "I need y'all. I need some extras. Can we go 4 for 100. But y'all gotta come get it soon as I get back because I don't wanna hold it". The message was not responded to. On November 25, 2024, "Matt And Jess" stated, "We will be coming to see you tonight sometime". They followed up on November 26, 2024, "What's up? Fell asleep last night. Call me when you wake up so we can come see you". HILSON later asked, "Where y'all at?". They responded, "Home". HILSON stated, "I been waiting on y'all to call me. I said 45 minutes." "Matt And Jess" responded, "No, you said you'd call once you handled it. Why you treating me like I'm stupid...Can I get my stuff or what?". There was no additional communication until December 8, 2024. HILSON asked, "Y'all don't even answer the phone for me no more huh? I know y'all woke because y'all called me back on accident...I got something for y'all. Y'all need to to call me asap". On December 25, 2024, HILSON asked, "y'all want this 4 for 100?". "Matt And Jess" responded the following day, "Can you bring those to me today?". HILSON responded, "Yes". "Matt And Jess" stated, "Sooner the better. Don't be concerned over a missed call or calls. We are here all day, unless I call n tell you I'm leaving for something". HILSON replied, "Ok cool". Later, "Matt And Jess" asked, "What's up??". HILSON responded, "She haven't even made it here yet. I'm coming Matt...Calling my ride now...I'm bringing 7". "Matt And Jess" then asked, "Where are ou? You said 2 min 20 ago". The conversation was stagnant until February 11, 2025. HILSON stated, "Don't say I didn't try calling. I tried multiple times". On February 15, 2025, HILSON asked, "Can yall send me 50 off the 200? And I will cover the 50 when I leave. So all y'all gotta give me 150 and y'all still get the something". They responded, "It's a bad move TJ...Whatever. I don't have the patience to discuss anything else". On March 31, 2025, HILSON stated, "I'm leaving tomorrow. Y'all good?". "Matt And Jess" replied on April 1, 2025, "What's going on? You back or what's up?". HILSON asked, "Y'all want

something or not?".

83.     Case agents then review messages between HILSON and an unnamed contact with telephone number 414-842-9733. The text conversation between the two began on November 9, 2024. On November 11, 2024, telephone number 414-842-9733 stated, "I need a dub". HILSON responded, "Ok". On November 15, 2024, telephone number 414-842-9733 stated, "Bro I need a gram". HILSON responded, "5 minutes".  Based on my training and experience, drug users often use terms like "dub" and "gram" to describe amounts of drugs they wish to purchase from drug traffickers.  It appeared the two also met on November 24, 2024. On December 29, 2024, HILSON stated, "New stuff". telephone number 414-842-9733 responded, "5836 N76". On January 2, 2025, telephone number 414-842-9733 stated, "Hey I got enough for a gram now". On January 7, 2025, HILSON again stated, "New stuff". On February 21, 2025, telephone number 414-842-9733 stated, "Still send it bro". HILSON replied, "2866 n 23". The following day telephone number 414-842-9733 stated, "Bro I need a gram" later followed by, "Need another gram when you get time bro". HILSON responded, "ok". On March 6, 2025, telephone number 414-842-9733 stated, "Bro when I shop again take $20 off I didn't know Trish paid you already...Or put extra in the sack". On March 31, 2025, telephone number 414-842-9733 said, "I don't know why B always talking about holding a dub knowing that don't do nothing if you can stand it tee can you do a half I will have your $45 later". On April 1, 2025, HILSON responded with multiple unanswered messages, "I really need that money...I'm here...Dang I really need that money. Let me know something. Talk to me, just in case I gotta do something else for right. I'm not mad just let me know something...Really? That's how y'all gone do me? I really needed that money. Y'all can let me know something...just be honest. If you don't got it let me know. I can't do nothing but wait...So y'all really gone play with my money instead of being honest and letting me know what's going on. I'm gone come to y'all

house everyday and act a fool. I'm trying to be nice about this...I don't know why would y'all do that to me. I told y'all I didn't have it like that. And I really couldn't do it. I really needed that money. If y'all didn't have it y'all should of just said that. This y'all second time doing this to me...I really need you. But don't trip, im gone bless you! I got something nice for you".

84.     The next thread is between HLISON and contact "Makes" with telephone number 414-439-5980. Based on training, experience, and the content of the messages, case agents believe "Makes" is an additional drug customer of HILSON's in which the conversation began on November 4, 2024. Between November of 2024 and January of 2025 it appeared multiple transactions had occurred between the two. On January 19, 2025, "Makes" stated, "I got 40". HILSON responded, "Ok". "Makes" later indicated they were, "at the door". On January 21, 2025, "Makes" followed up, "Bro tha gram didn't do nothing to us...smh...text me". HILSON did not respond. On January 23, 2025, "Makes" stated, "Need a g u got some different..?". HILSON responded, "yeah". "Makes" later stated, "I'm here". On January 27, 2025, "Makes" asked HILSON, "You gack from the chi??? You at home?? Here I come got 40". HILSON responded, "Ok". On January 30, 2025, HILSON advertised, "New stuff...Come try the new stuff...you missing out". On February 3, 2025, HILSON asked, "Perks?". "Makes" then stated, "here" and HILSON directed them to the door. On February 4, 2025, HILSON stated, "It's never mind be I tried to give you a deal. I was trying to bless you because I needed the money. That's it that's all. I was about to give you a 1.8 for 70...Can you just come get gram bro. I really...Need the money". On March 7, 2025, the two arranged to meet at a Wendy's to conduct a transaction. On March 8, 2025, "Makes" sent HILSON a photograph with the caption, "Where's the xtra smh". The photograph depicted a white rock-like substance on a digital scale which read 1.00". "Makes" then stated, "U said u was throw some xtra". On March 10, 2025, "Makes" followed up, "Let me know

when it gets better".

85.     In total there were 62 text message conversations saved on the flip phone with telephone number 414-627-881. Additional conversations were briefly reviewed that also showed HILSON conducting what were believed to be drug transactions. Not all conversations were documented in this affidavit.

86.     While reviewing an iPhone that belonged to Montrell D. HILSON, with the assigned number of 262-395-8053, case agents observed telephone number 414-334-5809 which was an unsaved contact in the iPhone.  There was one outgoing text to that number on January 12, 2024.  There is a saved contact of "Man Man" with telephone number 414-344-8534.  Based on the investigation into Montrell D. HILSON and Jeremiah D. HILSON (DOB XX/XX/1993), case agents identified "Man Man" as the nickname for Jeremiah D. HILSON (DOB XX/XX/1993).

87.     On January 13, 2025, an unsaved contact sent Montrell D. HILSON a text asking for "Man Mans" number and Monrell D. HILSON replies 414-502-5274.

88.     While reviewing contacts between Montrell D. HILSON and telephone number 414-502-5274 in HILSON's phone.  Case agents noted between June 18, 2023 and April 2, 2025 there was 217 total texts messages exchanged between the two.  Between January 22, 2025 and April 2, 2025 there was 160 regular and facetime calls total between the two.  Based on my training and experience, those engaged in drug trafficking will often make calls or facetime other co-conspirators in an attempt to evade law enforcement.

89.     While reviewing the content in the text messages between Montrell D. HILSON and telephone number 414-502-5274, case agents documented a conversation exchange beginning on February 27, 2025 where the Montrell D. HILSON, using telephone number 262-395-8053 sent telephone number 414-502-5274 (Jeremiah D. HILSON) a message stating "Home".  Telephone

number 414-502-5274 replied "WYO". Montrell D. HILSON replied "Whatever. You wanna come get me".

90. On March 24, 2025 beginning at 1:02 A.M. Montrell D. HILSON sent "3000". telephone number 414-502-5274 (Jeremiah D. HILSON) replied "huh". Montrell D. HILSON replied "You want this 3gs???". Based on training and experience, case agents believe this message is referring to Montrell D. HILSON asking Jeremiah D. HILSON (DOB XX/XX/1993) if he wants $3,000.00. Telephone number 414-502-5274 (Jeremiah D. HILSON) replied "from" and Montrell D. HILSON replied "me". Telephone number 414-502-5274 (Jeremiah D. HILSON) replied "Wym bro" and "U need something". Montrell D. HILSON replied "Yeah" and telephone number 414-502-5274 (Jeremiah D. HILSON) replied "AM?". Montrell D. HILSON replied "That's cool.." and "Forreal bro". Telephone number 414-502-5274 (Jeremiah D. HILSON) replied "Yea u the one aint hit me back last could u aint wait" and "I said 1 hour". Montrell D. HILSON replied "Need you bad bro. Aint had nothing in a week!", "Whats up", and several thumbs down emojis.

91. Later on March 24, 2025, telephone number 414-502-5274 (Jeremiah D. HILSON) sent "On ft brother" and Montrell D. HILSON replied "Do you think they would take it back". Telephone number 414-502-5274 (Jeremiah D. HILSON) replied "Ion no before this was never a problem wit dude", "It always dat…" and "Way". Montrell D. HILSON replied "Ok…Just try, if not then it's cool", "Out here", "WAY", and "it's over". Telephone number 414-502-5274 (Jeremiah D. HILSON) sent "My bad n naw he gone hot me back". Montrell D. HILSON replied "It's getting late and I know nigga don't like doing business late. So let me know what's up". Telephone number 414-502-5274 (Jeremiah D. HILSON) sent "Nut my phone dead". Montrell D. HILSON sent "Ok. I assumed it died, I tried to call you back and you didn't answer. That's why

I texted you". This is the last message on March 24, 2025.

92. On March 25, 2025 at 12:31 A.M. the messages begin with Montrell D. HILSON sending "Should I touch this stuff or what bro". Telephone number 414-502-5274 (Jeremiah D. HILSON) replied "Big Bro" and Montrell D. HILSON sent "Yeah". Telephone number 414-502-5274 (Jeremiah D. HILSON) messaged "He gone nit me back for sure". Montrell D. HILSON sent "Ok I'm waiting", So it's over for tonight", I'm not gone touch this stuff bro, call me in the morning, I don't want this, and "damn bro this was my damn near last". Telephone number 414-502-5274 (Jeremiah D. HILSON) sent "bro I fell asleep n ion wat he doin I'm getting mad too". Montrell D. HILSON "What's the word" and "Whats up bro, what dude talking about? I'm just sitting around". That is the last message documented in this report.

93. The message thread that was described above is consistent with the date and time where CS-1 notified case agents about Montrell D. HILSON receiving 300 grams of "bad dope" from Jeremiah D. HILSON (DOB XX/XX/1993). Further about Montrell D. HILSON believing that the heroin/fentanyl was not strong enough or of good quality. These messages would confirm that the information provided to CS-1 was accurate and truthful and clearly show that Montrell D. HILSON had purchased illegal narcotics from a number associated to Jeremiah D. HILSON. Further, these messages are consistent with Montrell D. HILSON and Jeremiah D. HILSON (DOB XX/XX/1993) engaging in drug trafficking together.

94. There has been minimal review of the iPhone belonging to Montrell D. HILSON, a complete review is ongoing.

I. **Attempted Flight of Jeremiah D. HILSON (DOB XX/XX/1993) and Destruction of Evidence**

95. On April 3, 2025, case agents executed a federal search warrant of Jeremiah D. HILSON's (DOB XX/XX/1993) residence, XX08 North 42nd Street, Milwaukee, Wisconsin.

Page 33

When case agents entered the residence, Jeremiah D. HILSON's (DOB XX/XX/1993) ran from the living room /bedroom area to the rear of the residence. Case agents were in the rear of the residence, and observed Jeremiah D. HILSON (DOB XX/XX/1993) peer towards the back door. Based on training and experience, Jeremiah D. HILSON's (DOB XX/XX/1993) conduct was consistent with someone engaged in illegal activity attempting to flee from law enforcement and/or attempting to destroy evidence.

96.     After observing case agents at the rear door, Jeremiah D. HILSON (DOB XX/XX/1993) changed his flight to the bathroom, closing the bathroom door. He was holding a backpack when he entered the bathroom. Case agents then attempted to remove Jeremiah D. HILSON (DOB XX/XX/1993) from the bathroom, but he refused. Case agents were able to gain entry into the bathroom and Jeremiah D. HILSON (DOB XX/XX/1993) was sitting on the toilet and stated he was "shitting". Case agents had to physically remove Jeremiah D. HILSON (DOB XX/XX/1993) from the toilet. On the floor of the bathroom where two cellphones and a backpack that contained a scale and what appeared to be THC gummies. Inside the toilet was plastic wrap, consistent with drug packaging. Toilet paper was placed over the top of the plastic wrap, in what appeared to be an attempt to conceal the plastic. Given the circumstances, case agents were not able to preserve the evidence destroyed by Jeremiah D. HILSON (DOB XX/XX/1993).

97.     Case agents continued the search of Jeremiah D. HILSON (DOB XX/XX/1993)'s residence and located:

      a.  three cell phones;
      b.  a handgun, a black 9mm Ruger with an empty magazine;
      c.  a black 9mm magazine with 15 rounds;
      d.  a box of 9mm rounds;
      e.  a rifle, M4 5.556 MM Black colt with magazine containing 13 rounds;
      f.  two  additional rifle magazines, one containing 30 rounds and one containing 16 rounds;
      g.  three digital scales;

     h.   997 grams of green leafy vegetable material testing positive for THC;

     i.   243 grams of THC packages;

     j.   a roll of labels for "Medical Cannabis"; and

     k.   a bottle of Promethzine.

98.    Jeremiah D. HILSON (DOB XX/XX/1993) was arrested and read his Corley and Miranda rights. Jeremiah D. HILSON initially waived his rights and admitted to case agents that he goes by the name of "Man Man". Jeremiah provided the phone number 414-334-5809 as a number for him. Jeremiah D. HILSON admitted that he does "sell" marijuana" and marijuana products, but when questions further he requested an attorney.

99.    Case agents are in the process of conducting a phones extraction of the two cellphones located at Jeremiah D. HILSON (DOB XX/XX/1993)'s residence.

100.    Case agents have been able to conduct a partial review of one of the cell phones located at the residence of Jeremiah D. HILSON. The cell phone is an iPhone with an assigned number of 414-430-2005.

## III.   CONCLUSION

101.    Based on the above information and facts, I submit that there is probable cause to believe that Montrell D. HILSON, a.k.a. "Nut" (DOB XX/XX/1993), Jeremiah D. HILSON, a.k.a. "Man-Man" (DOB XX/XX/1993) have violated the laws of the United States including, Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies), 856 (Maintaining a drug involved premises) and Title 18, United States Code, Sections 924(c) (Possession of a Firearm in Furtherance of Drug Trafficking Crime) and 2(a) (Aiding and Abetting the Aforementioned Offenses), which occurred in the Eastern District of Wisconsin.